IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

RECEIVED
~~DU~~ DOCKET UNIT
2018 SEP 11  AM 10: 39

| | |
|---|---|
| GNANA M. CHINNIAH a/k/a<br>GNANACHANDRA M. CHINNIAH<br>**Plaintiff**<br><br>v.<br><br>**FEDERAL ENERGY REGULATORY<br>COMMISSION, JOHN SPAIN, and<br>PRAPA HARAN**<br>**Defendants** | : CIVIL ACTION NO:<br>:<br>:<br>:<br>:<br>: **18 CV 8261**<br>:<br>:<br>:<br>: |

## COMPLAINT

AND NOW, comes the Plaintiff, Gnana Chinniah, and brings this civil action before this Court, and, in support of his Complaint against the Defendants, avers as follows:

1.      The Plaintiff, Gnana Chinniah, is an adult individual who currently resides at 506 Erford Road, Camp Hill, Cumberland County, Pennsylvania 17011.

2.      The Defendant, Federal Energy Regulatory Commission (FERC) is a United States Government Agency with a Regional Office located at 19 W 34th Street, New York, NY 10001.

3.      The Defendant John Spain is employed by the Defendant FERC as the Regional Engineer (RE) at FERC's New York Regional Office (FERC-NYRO) located at the above address.

4.      The Defendant Prapa Haran is employed by the Defendant FERC as a Branch Chief (BC) at FERC's New York Regional Office (FERC-NYRO) located at the above address.

5.      This action is brought pursuant to 42 U.S.C. §§1981 and 1983, as it is for discrimination, retaliation, due process, and other violations under color of law against the Plaintiff for engaging in activities protected by the First Amendment, and for conspiracies related thereto under Sections 1982, 1983, and 1985(3), Whistleblower Protection Act 1989, Pub. L. 101-12 and

jurisdiction in this court is proper pursuant to 28 U.S.C. 1331 and 1343. The Complaint also includes claims under New York state law, and jurisdiction is proper pursuant to 28 U.S.C. § 1367, subject to the privisos set forth above.

6.      Plaintiff Chinniah was hired by Defendant FERC as a Civil Engineer to work at its New York Regional Office on 23 January 2017 under the direct supervision of Defendant Haran.

7.      Prior to hiring by FERC, Plaintiff Chinniah was employed as a Senior Engineer by a nationally recognized consulting engineering firm, Gannett Fleming, Inc, Camp Hill, PA for 18 years and Defendant Haran spoke to references to verify Plaintiff's exemplary employment record.

8.      Plaintiff Chinniah has been satisfactorily performing the work assignments from Defendants FERC and Haran as reflected by the quarterly performance evaluation during 2017.

9.      Defendant Haran mandated that his underlings including Plaintiff Chinniah to sign in and sign out in his office on those days they report to the FERC's New York Regional Office.

10.      Defendants FERC and Haran utilize a scheduling software called "DAMS" to keep track of the working schedules of those staff who perform dam safety inspections out in the field.

11.      Defendant Haran used Plaintiff to have him inform his as to the time a few of his underlings including Mr. Harold Kamara signed in/out of the "sign in sheet" that he keeps in office as he was aware and/or suspected that some of his underlings who have been cheating on his sheet.

12.      On 22 June 2017 around 9 am, when Plaintiff Chinniah was on his way to inspect a dam in Pocono Mountains in PA, Defendant Haran called to have Plaintiff to check as to what time Mr. Kamara had signed in his sign in sheet, without realizing that Plaintiff was not in the NYRO.

13.     On 13 July 2017 around 7:35 am, Plaintiff went to Defendant Haran's office to sign in the sign in sheet, Plaintiff noted that Mr. Harold Kamara had already "signed in" at 8:30 am.

14.     Plaintiff was concerned about the legitimacy of the time entered by Mr. Kamara, therefore, took pictures of the sign in sheet and the wall clock in Defendant Haran's office to document the actual time (7:35 am) when he noted the questionable time entered by Mr. Kamara.

15.     Plaintiff also took pictures of the work area of Mr. Kamara where there was no light or his laptop computer that confirmed Mr. Kamara was not in the NYRO building around 7:40 am Exhibit A will include the photos of the sign in sheet(s), wall clock and Mr. Kamara's work area.

16.     When Plaintiff was going away from Mr. Kamara's work area after taking the picture, he met Mr. Richard Deubert who had signed in at 7:05 am in Defendant Haran's sign in sheet, and inquired if Mr. Deubert had seen Mr. Kamara that morning within the NYRO building,

17.     Plaintiff also asked Mr. Deubert if he had noticed the time (8:30 am) that Mr. Kamara had entered when Mr. Deubert was signing in Defendant Haran's sign in sheet at 7:05 am.

18.     Mr, Deubert described the situation by saying, "things are out of control" and this type of unethical conduct of a few including Mr. Kamara was due to lack of actions by those supervisors including Defendants Spain and Haran who themselves are "teleworking" too often.

19.     Mr. Deubert also told the Plaintiff that he had complained to those in responsible positions about some serious unethical conduct of a few employees who were abusing the system, however, no action was taken to stop them other than suggesting him to leave the FERC-NYRO.

20.     Mr. Deubert told Plaintiff that he told the supervisor who had asked him to leave FERC-NYRO that, in fact, it is that supervisor should leave FERC as Mr. Deubert's leaving FERC was not going to save any tax payers' money, and pointed a few specific ongoing unethical issues.

21.     When Plaintiff told about this incident to a Senior Engineer, Dr. Vai Navaratnam, he said he was also very concerned about this and would promptly convey it to Defendant Haran.

22.     Plaintiff also followed up with Defendant Haran to make sure that he was aware of that incident on 13 July 2017 involving the questionable/unethical signing in of Mr. Kamara who was not in the NYRO building on that day, and suggested him to verify it with Mr. Richard Deubert.

23.     Although Defendant Haran was concerned about dishonest signing in/out of a few of his underlings including Mr. Kamara and Mr. James Huang, and used Plaintiff to inform him about this issue, he never showed any interest to follow up on this incident for almost two weeks.

24.     On 27 July 2017, Plaintiff went to see Defendant Spain to verify if he was aware of the incident involving Mr. Kamara's dishonest signing in/out that he had brought to the attention of Defendant Haran to make sure this matter is investigated by verifying with Mr. Richard Deubert.

25.     Defendant Spain was very defensive and downplayed this incident by justifying Mr. Kamara's questionable signing in of 8:30 am (when I saw it at 7:35 am), saying that he may have come to NYRO to sign in that day and may have left the office to perform dam safety inspections.

26.     When Plaintiff told Defendant Spain that Mr. Richard Deubert was privy to the serious unethical conduct of a few NYRO staff including Mr. Kamara, Defendant Spain became visibly angry and intimidated him by saying the supervision of these issues were not Plaintiff's

responsibility and blamed that Plaintiff showed him an attitude and asked the Plaintiff how long was he working for FERC-NYRO, with a threat to terminate Plaintiff's probationary employment.

27.     Plaintiffs repeatedly told that he was not showing any attitude to Defendant Spain but only wanted to have a meeting with his direct supervisor, Defendant Haran so the incident involving Mr. Kamara's dishonest signing in on 13 July 2017 is investigated to uncover the truth.

28.     Defendant Spain asked if Plaintiff was going to be in NYRO on Monday, 31 July 2017 to see if he could arrange for a meeting to discuss this incident with him and Defendant Haran.

29.     Around 11:37 am on 27 July 2017, Plaintiff followed up with an email to Defendant Spain copying to Defendant Haran, with a suggestion to include Mr. Deubert in the meeting that Defendant Spain verbally agreed to have to discuss this matter since Mr. Deubert was privy to it.

30.     Within a couple of minutes after Plaintiff sent the email (Exhibit B) copying to Defendant Haran, and a few senior staff including Mr. Deubert, Defendant Spain came rushing into the cubicle of Plaintiff, without asking for any permission, and whispered threats using derogatory language stating that Plaintiff was not even worth a half of what Mr. Kamara was doing for FERC.

31.     As the Plaintiff was in a shock and did not understand as to why Defendant Spain chose to rush to his cubicle which is located almost 20 yards away from Spain's office, Plaintiff asked Defendant to repeat what he whispered in "plain English" and louder to be clear to everyone.

32.     Defendant Spain started to rush back to office as Plaintiff's questioning him in loud voice that made neighboring staff engineers to peek their heads from their cubicles, to see what was going with Defendant Spain and the Plaintiff who is normally very quiet, minding his business.

33.     As Defendant Spain did not restate his threats that he had whispered in Plaintiff's ears, Plaintiff was following him behind asking him to repeat what said or give the same in writing.

34.     As Defendant Spain rushed back into his office and closed his door refusing to respond, Plaintiff showed the email that resulted in that confrontation with Defendant Spain to explain what happened to his secretary, Ms. Donna Samuels whose office was in front of Spain's.

35.     While Plaintiff was showing the email to explain Defendant Spain's intimidation and verbal abuse, Defendant Spain opened up his door and directed Ms. Samuels to contact the Federal Protection Service to have Plaintiff removed from the FERC-NYRO building immediately.

36.     As Plaintiff was very shaken by the verbal abuse and intimidation of Defendant Spain who directed his secretary to have him removed using federal agents, Plaintiffs told both Defendant Spain and Ms. Samuels that he was leaving the NYRO respectfully and immediately.

37.     Due to the veiled threats of termination of Plaintiff's employment, Plaintiff returned the security access card to FERC-NYRO to avoid any unwanted consequences by having this card.

38.     As Plaintiff honestly believed that he did not deserve any of the intimidation and threatened removal by federal agents for being a Whistleblower to the ongoing serious ethical violations that he witnessed, he told that he was going to consult with an attorney and left promptly.

39.     After being subject to the horrible treatment of Defendant Spain, Plaintiff did not feel fit to return to work at NYRO on Monday, 31 July 2017, therefore, sent an email around 8:30 am to Defendants Spain and Haran copying it to others involved. Exhibit C will include request for Sick Leave from Plaintiff and request to reschedule meeting to discuss ethical issues within NYRO.

40.     Instead of responding to the above email from Plaintiff around 8:30 am with his sick leave request, Defendant Spain sent a separate email around 1:07 pm saying that he placed the Plaintiff on Administrative leave with a recommendation to Human Resources of FERC-DC to terminate Plaintiff's "probationary employment" stating Defendant Haran concurred with him. Exhibit D will include email from Defendant Spain to Plaintiff ignoring his email on 31 July 2017.

41.     On 1 August 2017 around 8:37 am, Plaintiff sent an email to the direct supervisor of Defendant Spain, Mr. David Capka, by forwarding the email from Spain to clarify his position and to request him to follow the due process to investigate into this incident to be fair to all involved indicating that Plaintiff would fully cooperate with the Human Resources of FERC (Exhibit E).

42.     Mr. David Capka who is the Director of the Division of Dam Safety and Inspections (D2SI) replied promptly saying that he was forwarding that email to FERC's HR (Exhibit F).

43.     On 4 August 2017, Mr. Richard Deubert wrote to Defendants Spain and Haran, copying to Mr. David Capka that he was willing to discuss the serious ethical issues within NYRO by acknowledging that he received Plaintiff's email dated 27 July 2017, requesting for the meeting that resulted in Defendant Spain's threat forcing the Plaintiff to leave FERC-NYRO (Exhibit G).

44.     On 9 August 2017, Plaintiff sent another email to Defendants Spain and Haran and Mr. David Capka to follow up on the status of his Administrative leave and to find out a way to return the travel subsidy that was direct deposited into Plaintiff's checking account (Exhibit H).

45.     On 11 August 2017, Director of Human Relations of FERC, Mr. Sidney Chapman left a message in Plaintiff's cell phone indicating that he was directed by Mr. David Capka of D2SI of FERC to investigate into the incident and the alleged ethical issues within FERC-NYRO.

46.     Plaintiff promptly returned Mr. Chapman's phone call on the same day but could not speak to him until August 16, 2017 after another email follow up with the Director of D2SI, Mr. David Capka as Mr. Chapman did not answer calls/messages till August 16, 2017(Exhibit I).

47.     Plaintiff spoke to Mr. Chapman of HR of FERC for about 45 minutes on 16 August 2017 and explained the entire sequence of events that resulted in Defendant Spain forcing the Plaintiff to leave NYRO on 27 July 2017, and identified witnesses including Mr. Deubert, Ms. Borzillo who are aware of the ongoing serious ethical issues and Defendant Haran's sign in sheet.

48.     Mr. Chapman asked the Plaintiff to describe exactly what kind of derogatory and threatening language that Defendant used when he rushed into his cubicle shortly after receiving the email on 27 July 2017 and seemed to have understood the failure of Defendant Spain to act professionally by replying to Plaintiff's email to schedule a meeting to discuss those ethical issues.

49.     Mr. Chapman was also informed about Plaintiff's discussion with Mr. Deubert who witnessed the dishonest signing in of Mr. Kamara when he signed in at 7:05 am on July 13, 2017, and Ms. Kara Borzillo being privy to Mr. Kamara's and Mr. Huang's dishonest signing in/out etc.

50.     Mr. Chapman told Plaintiff that he would investigate into these matters and would contact the Plaintiff should he require any further evidence or testimonies to do his investigation.

51.     Defendant Haran also used a fellow FERC employee to influence the Plaintiff by leveraging a pending serious surgery on Plaintiff's wife as a bargaining tool with suggestions to not to complain the ethical issues to FERC's Head Quarters in Washington, DC, but schedule the surgery and seek some anger management counseling help before Plaintiff's health benefits ended.

52.     Defendant Haran violated the privacy of Plaintiff's wife by disclosing a very confidential conversation seeking Haran's permission to schedule a dam safety inspection during the Labor Day week in September at York Haven Dam in York, PA which is located 20 miles away from Plaintiff's residence in Camp Hill, PA so that Plaintiff could be with his wife after her surgery.

53.     After placing the Plaintiff on Administrative leave pending the investigation by Mr. Chapman of HR for almost six weeks, Defendant Spain sent an email on 11 September 2017 titled "Notification of Termination of Probationary Employment" with last day to be 15 September 2017.

54.     Defendant Spain also attached a letter explaining his own reasoning behind the termination that include Plaintiff's failure to seek permission to be away from work after he was forced out of NYRO on 27 July 2017, and being not dependable to do the type work assignments, by completely distorting the sequence of events to cover up the serious ethical issues within NYRO.

55.     For the purpose of exposing the willful false accusations of Defendant Spain such as Plaintiff did not seek permission to be away from work until Defendant Spain sent an email around 1:07 pm placing Plaintiff on Administrative Leave, Plaintiff sent his response, copying to all involved, by pasting the email that he sent around 8:30 am requesting sick leave and to reschedule the meeting on 31 July 2017 until further notice to discuss the ethical issues (Exhibit J).

56.     Plaintiff also sent another follow email in response to Defendant's email request on 11 September 2017, for the mailing address to ship Plaintiff's reading glasses from the work area at NYRO, clarifying the actual hiring date (23 January 2017) that Defendant willfully misstated to distort facts so that he could get away by using a 6-month probation as a cover to fire (Exhibit K).

57.     Plaintiff also copied his emails to Defendant Spain on 11 September 2017 to Defendant Haran, Mr. David Capka of D2SI of FERC, Mr. Chapman of HR of FERC, and Mr.

Deubert so that they are made aware of the unfair termination of Plaintiff for being a Whistleblower of the serious ethical issues, disputing Mr. Spain's baseless accusations and distorted hiring date.

58.     Plaintiff allege that Defendants Spain and Defendant Haran tarnished Plaintiff's reputation and violated his family's privacy by spreading baseless accusations through their covert actions to influence the Plaintiff by leveraging a pending surgery on his wife, and suggested counseling help, by influencing not to pursue Plaintiff's complaints to FERC's HR in Washington.

59.     Plaintiff also allege that Defendants Spain and Haran disposed all of Plaintiff's personal belongings from his work area at NYRO, other than a pair of eye glasses, and may have had access to personal information of Plaintiff and his family from the files with benefit records.

60.     Plaintiff sent an email to the Senior Management within FERC on 13 September 2017, requesting a thorough investigation into the ongoing serious ethical issues that Defendants Spain and Haran willfully covered up, by victimizing him for being a Whistleblower (Exhibit L).

61.     In response to Plaintiff's email on 13 September 2017 to the senior management of FERC that was copied to Defendants Spain and Haran, Mr. Deubert replied to all involved on 15 September 2017 which is a strong evidence/smoking gun about the ongoing serious ethical issues within NYRO Plaintiff complained and become victim despite being a whistleblower (Exhibit M).

62.     Plaintiff's emails to the senior management of FERC also included his request to follow the guidelines of EEOC and a proposal to continue his employment with a similar position within FERC's office in Washington, DC as an Alternate Dispute Resolution (ADR) means to resolve the dispute amicably in lieu of filing a federal complaint with this honorable court, however, Plaintiff received no response from the Defendants as of the filing date of this complaint.

63. Although Plaintiff has been trying to resolve the dispute amicably while dealing with his/family's health issues, as of this filing date Defendant FERC, through their legal counsels, has offered nothing more than a "spotless employment record" in exchange for a "global release" stating that Plaintiff "quit" his job when, in fact, he was forced to leave FERC-NYRO under threat.

## Count One

64.     Paragraphs 1 through 63 are fully incorporated herein by reference.

65.     The acts of Defendants FERC, Spain and Haran constitute serious violation of the provisions of the Whistleblower Protection Act 1989, Pub. L. 101-12 through retaliation by manipulating the probationary period as a cover to terminate Plaintiff's employment without any justifiable reasons, and by cover up and/or legalizing the ongoing unethical actions within NYRO.

WHEREFORE, Plaintiff demands judgment against the Defendants in the amount excess of $100,000.

## Count Two

66.     Paragraphs 1 through 65 are fully incorporated herein by reference.

67.     The acts of Defendants Spain and Haran constitute a violation of Plaintiff's and his family's right to privacy and willful damage by tarnishing their reputation by disclosing and/or disseminating personal information and baseless accusation with regard to Plaintiff's work performance to others within and outside of FERC to humiliate and/or influence Plaintiff's family.

WHEREFORE, Plaintiff demands judgment against the Defendants in the amount excess of $100,000.

## Count Three

68.     Paragraphs 1 through 67 are fully incorporated herein by reference.

69.     The acts of Defendants Spain and Haran constitute violation of Plaintiff's Civil Rights and First Amendment Rights and discrimination through selective enforcement of FERC-NYRO's policies and procedures with respect to signing in/out, and cover up of ongoing serious ethical issues that impact the work environment and morale of the Plaintiff and others at NYRO.

WHEREFORE, Plaintiff demands judgment against the Defendants in the amount excess of $100,000.

Respectfully Submitted,

Gnana Chinniah, Plaintiff, *Pro Se*

506 Erford Road

Camp Hill, PA 17011

(717) 732-6273 or (717) 979-9245
Email: chinniahg@hotmail.com

Date 7 September 2018

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

# PRIORITY
# ★ MAIL ★

★ Domestic only

PICKUP AVAILABLE

INSURANCE INCLUDED *

USPS TRACKING™ INCLUDED *

DATE OF DELIVERY SPECIFIED *

PRIORITY®
MAIL®

EXPECTED DELIVERY DAY: 09/10/2018

USPS TRACKING NUMBER

9505 5124 5841 8250 1990 63

USM P3
SDNY

WHEN U
A CU
LABE

P S 0 0 0 0 1 0 0 0 0 1 4

EP14F July 2013
OD: 12.5 x 9.5

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE



U.S. POSTAGE PAID
PM 2-DAY
LEMOYNE, PA
17043
SEP 07, 18
AMOUNT
$6.70
R2303S1-04450-03

1006

10007

FROM:

Gnana Chinniah
506 Erford Road
Camp Hill, PA 17011

TO:

Clerk of courts
Attn: Pro Se Intake Room 200
US District Court for Southern
500 Pearl Street
New York, NY 10007-1312

AM 10:39
11 SEP 18
SDNY PRO SE OFFICE

UNITED ST
POSTAL SE