Docket and File

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

GNANA M. CHINNIAH a/k/a : CIVIL ACTION
GNANACHANDRA M. CHINNIAH :
               Plaintiff : NO: 18 CV 8261 (VSB)
  :
v. :
  :
  :
FEDERAL ENERGY REGULATORY :
COMMISSION, JOHN SPAIN, and :
PRAPA HARAN :
          Defendants :

## BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

### I.  INTRODUCTION

The central issue raised by the Defendants in their Motion to Dismiss is whether any of the Plaintiff's claims can proceed in this Court, or are barred by various preemption and exhaustion theories.  The Plaintiff maintains that , 1) the Plaintiff has a right of review under the WPA in this Court, and, in addition, 2) equitable circumstances apply to his claims where, either he should proceed in this Court, or should be remanded to pursue his remedies through the MSPB for his non-WPA claims.

### II. ARGUMENT

#### A.  Plaintiff's Whistleblower Protection Act Claims are Reviewable in this Court.

In the Preliminary Statement portion of "DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT", the Defendants argue that this Court does not have jurisdiction of Plaintiff's whistleblower claims because the Civil Service Reform Act of 1978 ("CSRA") does not have jurisdiction in cases involving whistleblower retaliation claims.  The Defendants are incorrect.





USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10-24-19

RECEIVED
OCT 24 2019
VERNON S. BRODERICK
U.S. DISTRICT JUDGE
S.D.N.Y.

1

The 4th Circuit Court of Appeals found, in *Bond v. Leavitt*, 629 F.3d 369 (4th Cir. 2011), that the CSRA does provide for a direct right of action in federal district court; and that a person aggrieved by retaliation that is alleged to have resulted from protected whistle-blowing activities, may file a civil action in federal district court, pursuant to the Whistleblower Protection Act ("WPA"), 5 U.S.C. §§1221.  A copy of this controlling decision is attached hereto, at **Exhibit A**, for the Court's review.

To establish a claim under the WPA, a complainant is required to show only that he made a protected disclosure under 5 U.S.C. §2302(b)(8), and suffered an adverse personnel action based on his protected disclosure of "gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to the public health or safety," 5 U.S.C. §2302(b)(8)(A)(ii).

Moreover, the WPA is "intended to protect government employees who risk their own personal job security for the advancement of the public good by disclosing abuses by governmental personnel," *Willis v. Department of Agriculture*, 141 F.3d 1139, at 1144 (Fed.Cir. 1998).  Whether an employee suspects that his termination is the result of discrimination that may justify an EEO Complaint; or other nefarious reason that may justify an appeal to the MSPB, the WPA act's protection does not have an administrative mechanism under which resort by the employee is required, and a direct action was therefore clearly contemplated by the WPA.

As applied to this case, Plaintiff's Amended Complaint states a clear and viable direct claim under the WPA, and such claims ***have been upheld*** by at least one Court of Appeals (*Bond*).  Plaintiff submits that the allegations within his Amended Complaint are sufficient to satisfy the requirements of a direct claim under the WPA that (1) he reported gross

mismanagement, and/or an abuse of authority; and that (2) he suffered retaliation from having done so. Plaintiff therefore encourages this Court to adopt the finding in **Bond** (supra), and to find that the Plaintiff in this case has sufficiently pleaded a direct WPA action over which this Court has jurisdiction.

The Defendant also argues that Plaintiff was a "probationary employee" with resort to the OSC, for a potential remedy. Plaintiff was not a probationary employee at the time of his termination. Plaintiff was a high level, federal civilian employee with Defendant FERC. As such, he would have finished his 6-month probation prior to the decision by the Defendants to terminate him by forcing out of the office on 27 July 2017 by using threat of immediate removal using Federal Protective Service. The Plaintiff was hired by the Defendant on January 23, 2017. It is an undisputed fact that Defendant Spain willfully altered the hiring date of the Plaintiff from 23 January 2017 to 31 January 2017, to terminate him using the 6-month performance as cover with or without knowing that Plaintiff successfully passed the 6-month performance evaluation.

Plaintiff was placed on administrative leave and notified of the decision to remove him by e-mail dated July 31, 2017 – over a week after his probation had ended. The Defendants' suggestion that Plaintiff was a probationary employee is clearly a strategy designed to divert the Court's attention from the true issues in this case and, in fact, this stands as evidence of the retaliation about which Plaintiff complains, and justifies his Complaint in this Honorable Court.

The Defendants, in their Brief, state that "the CSRA sets forth the exclusive mechanism through which federal employees can challenge prohibited retaliatory personnel practices," (Def.Br., p.6), but provides no statutory reference for this argument, because the statute itself does not so mandate.

3

### B.   Equitable Circumstances Apply to Permit Plaintiff to Proceed in this Court

Plaintiff has addressed Defendants' procedural related defenses they raised in their Motion to Dismiss the Amended Complaint by explaining the extremely difficult circumstances that he and his family went through, as stated in paragraphs 64-70 that made them to come to this Honorable Court directly, and these allegations inform the basis of Plaintiff's claim that he was not provided proper direction and notice of all rights while dealing with an extremely abusive situation in his federal employment outlining the equitable circumstances central to his defense, which are fact-based determinations, supported by strong evidence to prove Defendants' abuse.

Plaintiff referenced Exhibits B through M in the Amended Complaint, but did not attach them to the pleading; however these documents outline the factual circumstances relevant to paragraphs 64-70 of the Amended Complaint, and are attached hereto as referenced in the Amended Complaint at paragraphs 30, 39-46, and 55-61. Plaintiff also included copies of photos as a proof for the unethical/fraudulent conduct of an employee who "pre-signed in" at 8:30 am for the day he was not even present in the office when the Plaintiff signed in at 7:35am on that day. The photo of the wall clock in Defendant Haran's office at 740am, and the photo of the work area of this employee without his computer on his table in his office without light proves it.

The Plaintiff persisted in the very beginning in the proper investigation of his claims of very serious unethical and fraudulent misconduct, as well as his right to due process, and was met with an immediate and persistent course of abusive and fraudulent conduct in response, to include the dissemination of his private family health issues.   Plaintiff reported, and requested investigations of, the fraudulent recording of times on "sign in" sheets at the FERC New York office, as well as the use of federal employees for the private pursuits of other FERC supervisors. He had extensive communications about these matters with his direct supervisors, Defendants

Haran and Spain and Human Resources of Defendant FERC, and his reports were confirmed by a co-worker, who had made complaints, and was also met with threats and intimidation, as well.

Plaintiff received no substantive response to any of his communications, but received a notice of his termination, with the fraudulent representation that he was a probationary employee, after willfully altering the hiring date of Plaintiff to justify his termination by using 6-month probationary period as cover although he successfully passed his 6-month performance review, creating confusion over his rights, after placing him on administrative leave for over six weeks. Affidavit of Director of HR of FERC confirms the correct hiring date of 23 January 2017.

Paragraphs 64-70 of the Amended Complaint outline all of the above, and the core of Plaintiff's argument is that the Defendants cannot benefit by their course of fraudulent conduct to continue to conceal the very serious ethical and legal issues raised by the Plaintiff, and his right to a proper remedy, especially when the Plaintiff was subjected to discrimination through the selective enforcement of Defendants' signing in/out procedures, and for violation of his family's privacy by using health insurance coverage as a bargaining tool in their attempt to silence him.

The Defendants argue that Plaintiff's equitable exhaustion issues are not even properly before this Court, but that belies the nature of equitable considerations, and the Plaintiff presents circumstances and credible factual evidence for his claims/reports that justify granting him relief.

Administrative filing requirements are subject to waiver and equitable tolling, with particular consideration given to litigants who are unassisted by trained legal counsel. *See Zipes v. Trans World Airlines,. Inc.*, 455 U.S. 385 (1982). When a plaintiff, as in the present case, provides compelling reasons why an administrative process was not pursued, the Court should

consider whether the equities permit the matter to proceed in this Court, or, alternatively, to direct that the matter proceed before the MSPB in the first instance.

It is an undisputed fact the Plaintiff was forced to surrender his "access card" to Defendant FERC's NY Regional Office under threat of immediate removal using the Federal Protective Services for requesting for a meeting with the presence of another veteran employee who witnessed the fraud/corruption/abuse of tax payers' money warrants this Court exercise all of its power/authority to protect the rights of the Plaintiff/victim and this matter be fully investigated. He was then placed on administrative leave, and remained out of the New York office for over six weeks, until his termination, effective September 15, 2017, with his termination falsely stating that it was his probationary employment although he satisfactorily met his 6-month performance review, despite no concern of work performance was raised in the past.

Plaintiff submits that the Defendants attempted to create confusion over his employment status under circumstances that they knew was very trying for him in order to benefit from their fraudulent course of conduct.  The requirement to go to the OSC and MSPB are for tenured employees, which have additional notice requirements that do not apply to probationary employees, and Defendants created confusion over the contours of the remedies available to the Plaintiff by fraudulently altering his hiring date to justify the firing by using probation as a cover.

It is time for this Court to apply equitable remedies to administrative exhaustion requirements in this case, as the OSC and the MSPB have proven to be failed avenues for whistleblowers, and Plaintiff submits compelling circumstances justifying relief.  See Blowing in the Wind:  Answers for Whistleblowers, William and Mary Law Review, volume 3, page 184.  In this article, the futility of the OSC and MSPB in the protection of whistleblowers is discussed at

length, and, in this case, Plaintiff brings claims that warrant the equitable exhaustion of his filing. Because of the futility of obtaining adequate relief from either the economic and emotional suffering endured by the employees who have filed claims, less waste, fraud, and abuse is being reported, with as little as one in ten persons who observe waste, fraud, and abuse reporting it to any of the reporting agencies. See p. 192. (Exhibit A includes copy of this article).

In the <u>Ziglar v. Abbasi</u>, 137 S. Ct. 1843 (2017) case cited by the Defendants, the courts are to undertake an analysis of whether the courts or Congress should provide a remedy for the unlawful conduct at issue. While that case involves claims under <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), and was not under the Whistleblower Protection Act, this case also involves <u>Bivens</u> claims against the individual Defendants, and Plaintiff argues that the laws passed by Congress have failed to provide an effective remedy for federal employees, and that these factors counsel that this Court should uphold the duties of the judiciary to provide a remedy for the violation of Plaintiff's legal and constitutional rights in light of extremely difficult personal/family circumstances of the Plaintiff.

In discussing the nullification of whistleblower protections by the MSPB, one United States District Judge identified the problem as follows:

> [j]udges in specialized courts, typically appointed for a term of years, have a temptation to look over their shoulders at the impact of their decisions on their future employment outside the specialized court, thus compromising their independence. This is notoriously a problem for administrative law judges, who regularly seek employment at the end of their terms with law firms that have regularly appeared before them. As a result, it is widely believed, though perhaps unfairly, that the decisions made by an outgoing administrative judge near the end of her term will seemingly be affected by the interests of the kind of clients represented by the law firms she would most like to join once her term is over.

See id. p. 214.  Senator Charles Grassley has also given a forum to whistleblowers who have suffered damages through the Department of Justice failure to enforce and uphold the protections offered to them for reporting waste, fraud, and abuse.  See e.g. https://www.whistleblowersblog.org/2019/09/articles/false-claims-qui-tam/grassley-why-is-the-justice-department-seeking-dismissal-of-whistleblower-lawsuits/.

It is clearly time for the courts to protect the constitutional rights of whistleblowers in federal employment by recognizing that the courts are the proper forum for such protections, with a long history of jurisdiction over First Amendment claims, and the expertise to offer the full protection of the laws to the honest whistleblower like the Plaintiff who has been victimized.

Plaintiff further submits that his First Amendment whistleblower claims present a new context to extend a Bivens remedy, as the state of the law now would reward individuals in the chain of employment who are involved and implicated in the course of conduct that is the subject of the complaint from taking action to silence the federal employee bringing the claim.  Defendant cites the Jarvis v. Cardillo, 98-CIV-5793 (RWS), 1999 WL 187205, at *11 (S.D.N.Y. Apr. 6, 1999) case which held that the federal employee could not pursue a claim under Bivens, but there appear to be no appellate court decisions on the issue, and this case presents the equitable circumstances that justify a departure from that precedent, and allow the Bivens claims for the First Amendment whistleblower cases to proceed in this Honorable Court.

Plaintiff had legal, ethical, and moral duties to disclose the fraud and abuse as to which he was a direct witness, and did so, and requested that these matters be investigated properly, and Plaintiff submits that all the Defendants, together with the U.S. Department of Justice, and even this Court, have duties to not just let these matters go unaddressed due to some technical procedural issues interjected by the Defendants to keep all these matters quiet, and allow the waste and abuse,

as well as the individual defendants abuse and concealment to continue.  At some point, someone is going to need to address these issues, and this Court should apply the equitable exhaustion document to this case, allowing all his claims to proceed in this Court.

Plaintiff raises two issues that the Defendants did not address in their Motion to Dismiss. First, while mentioned in passing in footnote seven of their Brief, the Plaintiff did request that all of his EEOC rights be preserved.  At paragraph 62 of the Amended Complaint, Plaintiff demanded that all EEOC guidelines be followed, which claims cover discrimination.  Defendants recognize the principal in footnote 7 of their Brief that the federal district courts do have other classes of claims, including discrimination actions, and, in this case, claims involving federal employment under *Bivens*.  While the case limited the claims to those raised administratively, Plaintiff raises claims of discriminatory treatment/selective enforcement of him and his family together with due process claims, and other personal capacity claims against Defendants Spain and Haran over which this Court should assert jurisdiction under the above principles.  *See Bond.*

## III.  CONCLUSION

For all of the foregoing reasons, Defendants' Motion to Dismiss must be denied.

Respectfully Submitted,

G. Chinniah

Gnana Chinniah, Plaintiff, *Pro Se*

506 Erford Road

Camp Hill, PA 17011

(717) 732-6273 or (717) 979-9245
Email: chinniahg@hotmail.com

Date 10/10/2019

Exhibit A

Q

# NIH Whistleblower Wins Right to Federal Court Trial

*Please, share this page*                              🐦   f   📌

Washington, D.C. January 5, 2011. On Monday, the United States Court of Appeals for the Fourth Circuit ruled in favor of a sickle cell disease researcher who blew the whistle on improper cloning of blood cell lines. The decision clears the way Dr. Duane Bonds to proceed with her claim that the National Institutes of Health fired her in retaliation for blowing the whistle on the improper cloning of cell lines without consent.

This is the first case in which a federal employee will be allowed to pursue a whistleblower lawsuit in federal district court.  Dr. Bonds' attorney is Michael Kohn, president of the National Whistleblowers Center and a partner with Kohn, Kohn & Colapinto, LLP, in Washington, DC. Kohn said:  "This decision expands the rights of some federal workers to pursue their whistleblower claims in federal district courts around the country. Unfortunately, since Congress continues to treat federal employees as second-class citizens this right is only available to federal employees who are able to bring a race, sex, age, national origin or religion claim in conjunction with a whistleblower claim. Otherwise, a federal employee has no right to a federal court hearing."

Dr. Bonds, a female African-American medical officer, worked under National Institute of Health's National Heart Lung and Blood Institute (NHLBI) since 1990.  She was responsible for coordinating and overseeing all of NHLBI's sickle cell disease human clinical trials and epidemiologic studies.  Sickle cell disease is the most frequently inherited blood disorder in the United States, which in this country afflicts primarily persons of Sub-

Q

Dr. Bonds learned that blood from African-American infants was taken from participants enrolled in the clinical trial for which she was the project officer without proper informed consent in order to create immortalized cell lines for future scientific study. Dr. Bonds was shocked when she learned of the unauthorized cloning and, as the project officer ordered the immediate destruction of all of the improperly created cell lines. Bonds' supervisor, Dr. Charles Peterson, interceded and overruled Bonds' order. Dr. Bonds subsequently brought her concerns to NHLBI's Director, Dr. Elizabeth Nabel, who initially agreed with her, but ultimately failed to take steps to destroy the cell lines.

Retaliation against Dr. Bonds was swift. Within days of raising the issue of the illegally cloned cell lines with Dr. Nabel, a memorandum was handed to Dr. Bonds which stated that she was under investigation and was being summarily removed her from her role as the Sickle Cell Disease Coordinator and was threatened with termination if she raised concerns about the illegally cloned cell lines or discussed that she had been removed from her position with anyone. NHLBI then paid an outside attorney over $100,000 of taxpayer money to conduct the investigation that led to her termination.

Frustrated by the corrupted internal process, Dr. Bonds decided to report the existence of the illegally cloned cell lines to the federal Office of Special Counsel (OSC). The              that NHLBI's failure to destroy the cell lines violated federal law and issued a report to the President to that effect. In the midst of the OSC investigation, NHLBI illegally searched Dr. Bonds' emails with her attorney and located a copy of the OSC complaint.   Bonds was terminated shortly after that when she was blamed for missing expiration dates on drug labels used by outside investigators in one of her studies. Dr. Bonds supervisor, Dr. Peterson, knew that the missing labels had been reported a year earlier to others and ignored this fact in order to blame Dr. Bonds.

The Fourth Circuit ruling means that Dr. Bonds can proceed in a federal district court to prove that her discharge was part of a witch-hunt that was mounted in response to her whistleblowing. Attorney Kohn further stated: "The time has come for NHLBI to answer for its decision to gag Dr. Bonds and terminate her for exposing unethical treatment of study participants."

The Court of Appeals decision reinstates Dr. Bonds' claims against NHLBI under the Whistleblower Protection Act and the Civil Service Reform Act (CSRA). However, it let stand the lower court's summary judgment against Dr. Bonds on her claim of race discrimination.

Dr. Bonds released the following statement:  "I am grateful that the Court of Appeals recognized the importance of allowing me to bring my whistleblower case forward. I wish that Congress would provide a new law granting all federal whistleblowers modern legal protections."

Links:

N￼￼￼￼ ￼ D￼￼￼ ￼ ￼￼￼￼

629 F.3d 369 (2011)

## Duane R. BONDS, M.D., Plaintiff-Appellant,

v.

## Michael LEAVITT, Secretary Department of Health and Human Services; Department of Health and Human Services; National Institutes of Health; National Heart, Lung, and Blood Institute of the National Institutes of Health, Defendants-Appellees.
## Project on Government Oversight; Public Employees for Environmental Responsibility, Amici Supporting Appellant.

No. 09-2179.

**United States Court of Appeals, Fourth Circuit.**

Argued: October 26, 2010.
Decided: January 3, 2011.

372   *372 ARGUED: Michael Kohn, Kohn, Kohn & Colapinto, LLP, Washington, D.C., for Appellant. Allen F. Loucks, Office of the United States Attorney, Baltimore, Maryland, for Appellees. ON BRIEF: Richard R. Renner, Kohn, Kohn & Colapinto, LLP, Washington, D.C., for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellees. R. Scott Oswald, Jason Zuckerman, The Employment Law Group, PC, Washington, D.C.; Paula Dinerstein, Senior Counsel, Public Employees for Environmental Responsibility, Washington, D.C.; Scott H. Amey, General Counsel, Project on Government Oversight, Washington, D.C., for Amici Supporting Appellant.

Before TRAXLER, Chief Judge, GREGORY, Circuit Judge, and HAMILTON, Senior Circuit Judge.

Affirmed in part, reversed in part, and remanded by published opinion. Chief Judge TRAXLER wrote the opinion, in which Judge GREGORY and Senior Judge HAMILTON joined.

# OPINION

TRAXLER, Chief Judge:

Dr. Duane Bonds appeals district court orders dismissing some of her employment claims and granting summary judgment against her on the others. We affirm in part, reverse in part, and remand for further proceedings.

## I.

Bonds is an African-American female doctor who has worked during her medical career to fight "sickle cell disease and other medical disorders that severely impact fetal and maternal health."[1] J.A. 442-43. In 1990, after years in private practice and academia, she became Deputy Chief of the Sickle Cell Disease Branch of the Division of Blood Diseases and Resources ("DBDR"), a division of the National Heart, Lung, and Blood Institute ("NHLBI") of the National Institutes of Health ("NIH"). In 1998, Dr. Charles Peterson, Director of the DBDR at NHLBI, became Bonds's second-line supervisor. Dr. Blaine Moore, Program Director for the DBDR's Blood Diseases Program, became Bonds's first-line supervisor in late 2003.

373   [2] For much of her NIH career, Bonds received consistently high performance appraisals, promotions, and awards, *373 and she was recognized as a leading researcher of Sickle Cell Disease.

In October 1999, Bonds filed an administrative Equal Employment Opportunity ("EEO") complaint against Peterson alleging that he sexually harassed her by asking her to share a hotel room with him during an overnight business trip and that he began interfering with her professional duties when she refused him.[3] Peterson subsequently removed Bonds from her position as NHLBI's Sickle Cell Disease Group Leader, prompting Bonds to file a second EEO complaint in March 2003. In settlement of that dispute, the NHLBI in April 2004 created a new position for Bonds: the Division of Blood Diseases and Resources Sickle Cell Coordinator.

During Bonds's time at NIH, NHLBI initiated two sickle-cell clinical drug trials, "Baby Hug" and "SWiTCH," which Bonds initially led as project officer ("PO"). The two trials began in the years 2000 and 2005, respectively. Baby Hug studied whether administering the drug Hydroxyurea to infants could prevent the onset of end-organ damage, the major source of morbidity and mortality in sickle cell disease patients. SWiTCH studied the effect of the same drug on infants who had suffered a stroke. Baby Hug was a contract-funded study, which means that while NIH provides the funding, outside doctors and researchers perform the recruitment, collection, and analysis. The investigator responsible for processing specimens collected for the trial was Dr. Russell Ware, who was employed by St. Jude Children's Research Hospital in Tennessee.

Central to the present appeal is a process known as Epstein-Barr virus ("EBV") cell line transformation, under which EBV is mixed with blood cells from study participants, causing the cells to transform and grow indefinitely. This technique can be used to create an unlimited DNA supply without drawing new blood from study participants. According to Ware, he first discussed utilizing EBV cell line transformation in 2003, when he attended a conference at the NIH at which the process was recommended. Ware asserts that Bonds approved the use of the process for Baby Hug in late 2003 or early 2004.

The controversy regarding this process began in early September 2005 at a monthly steering committee meeting when Ware presented a report that he had established cell lines from DNA samples that had been collected from study participants using EBV cell line transformation. Bonds stated in an e-mail to Ware that she had been "dismayed" to learn that Ware had been immortalizing cell lines derived from the Baby Hug subjects.[4] J.A. 545. The e-mail asserted that "NHLBI did not authorize this work, it is not in the protocol, and the work is not specifically mentioned in the consent forms."
[5] J.A. 545. Accordingly, the message requested that Ware destroy *374 the cell lines immediately. When Moore and Peterson refused to support her decision, Bonds raised her concerns to the Data and Safety Monitoring Board ("DSMB"), which is tasked with protecting study participants' interests. On October 5, 2005, the DSMB recommended that the cell lines be destroyed unless the proper consent was obtained.

Not satisfied with that result, and believing that destruction of the lines was the only appropriate course of action, Bonds brought her concerns to Dr. Elizabeth Nabel, who was the Director of NHLBI and the person to whom Peterson reported. At Bonds's urging, Nabel initially ordered that the lines be destroyed. However, Nabel was subsequently contacted by Dr. John Cunningham, the Chair of the Institutional Review Board ("IRB") at St. Jude. He advised Nabel that the individual IRBs at the various Baby Hug clinical sites had jurisdiction over the immortalized cells. Accepting this assessment, Nabel sent letters to the IRBs urging them to either destroy the lines or obtain specific consent from the patients for retention of the lines.

Nabel received varying responses. Some IRBs believed the consent forms already covered the immortalization, while others believed efforts should be made to "re-consent" the study participants. This latter group reasoned that once the cell lines were immortalized, the study participants themselves should be able to express their preference regarding whether the biological material would be destroyed. Unbeknownst at the time to Moore and Peterson, Bonds eventually contacted the Office of Special Counsel ("OSC") regarding the cell lines in late December 2005, asserting that retention of the lines violated federal law. See 45 C.F.R. § 46.116 (2010) (providing that "[e]xcept as provided elsewhere in this policy, no investigator may involve a human being as a subject in research covered by this policy unless the investigator has obtained the legally effective informed consent of the subject or of the subject's legally authorized representative"); 45 C.F.R. § 46.122 (2010) ("Federal funds administered by a department or agency may not be expended for research involving human subjects unless the requirement of this policy have been satisfied.").

Deciding that Bonds's cell line concerns warranted investigation, the OSC forwarded them to the Secretary of the Department of Health and Human Services ("HHS"). As a result, HHS's Office of Inspector General ("OIG") initiated an investigation, interviewing Nabel, Peterson, Moore, and others in early 2006. After receiving a report from OIG in June 2006, the OSC issued its final report in December 2007 concluding that NIH officials "participated in the violation of federal law." J.A. 458.

Besides being the subject of an OSC investigation, the cell line controversy also marked the final straw for Ware in his relationship with Bonds. On October 11, 2005, he wrote to Moore requesting that Bonds be removed as PO for SWiTCH, for which Ware was the principal investigator. Prior to making that request, Ware had conferred with several key consultants in the then-recently funded project who agreed the trial would be best served if Bonds were replaced. In his affidavit, Ware explains that while his prior experiences *375 with Bonds had been "decidedly negative," their relationship had taken a particularly ugly turn with the cell line controversy in that Ware viewed Bonds as having unfairly attacked his motives in an "accusatory, abrasive manner." J.A. 98. Additionally, Ware and Dr. Winifred Wang, who were chair and deputy chair of the

Bonds v. Leavitt, 629 F. 3d 369 - Court of Appeals, 4th Circuit 2011 - Google Scholar

Baby Hug Steering Committee, both complained that often the information Bonds provided them concerning decisions made by the DSMB was incorrect to the point that they no longer trusted Bonds. Ware further maintained that Bonds's "abrasive, controlling style of managing the study" was a significant problem. J.A. 99. Dr. Susan Shurin, NHLBI's deputy director, also "experienced significant difficulties relating to [Bonds'] management of the study," primarily relating to Bonds' "bypass[ing] the group process" and her "[i]nformal and misleading communication of DSMB recommendations." J.A. 106-07.

Moore voiced concern over these issues and also expressed worry that Bonds's involvement as SWiTCH PO would be too much for her to effectively handle in light of her numerous other duties, including serving as Baby Hug PO. (These concerns had been documented in Bonds' mid-year performance review four months earlier in July 2005.) In light of all of these factors, Moore decided to remove Bonds from her position as SWiTCH PO. He explained to Bonds in person his reasons for her removal and also drafted a memorandum documenting the decision. Bonds subsequently filed an EEO complaint regarding her removal, alleging discrimination and retaliation by Peterson and Moore, and by Dr. Liana Harvath, who was the Deputy Director of the DBDR.

In November 2005, Moore also temporarily replaced Bonds as PO of the Baby Hug trial. He explained that a formal investigation was needed to address the concerns that had been raised regarding Bonds's performance as Baby Hug PO and in other areas of her work. Moore maintained that removing Bonds from that position during the investigation would give management the best opportunity to fairly evaluate their concerns.

The investigation of Bonds, which included an examination of her office computer, took an important and surprising turn when it was discovered that Bonds had improperly sent sensitive NHLBI information, including budget figures related to upcoming negotiations with potential contractors, to persons not entitled to that information. The recipients included her attorney, her priest, her church spiritual counselor, and Dr. Herman Branson, a former NHLBI employee who was himself involved in employment litigation against the agency.

The examination of Bonds's computer also revealed the whistle-blower disclosure statement that Bonds had filed with the OSC. The document, which Moore loaded onto his computer, alleged that Peterson had wanted to terminate Baby Hug and had engaged in gross waste, fraud, and abuse in an attempt to do so, and that NHLBI was illegally preserving the immortalized cell lines created from the blood product of Baby Hug participants.

On February 21, 2006, as the investigation was proceeding, Moore directed Bonds to spend the next 15 days primarily cleaning her office. In a memo to Bonds, Moore stated that Bonds had left her office in a "continuous state of clutter and messiness," which had caused significant expense during a recent move. J.A. 624. Moore further instructed Bonds to use her computer "only for communications related to the MSH follow up extension" and to copy Moore on such communications.[6] *376 J.A. 624. Moore also instructed Bonds to keep her office door open at all times.

376

Two days after receiving these instructions, Bonds e-mailed Peterson to alert him that she intended to attend a grant study section meeting outside of NIH that was scheduled to review her grants portfolio. Peterson allegedly called Bonds out of the meeting and "threatened [her] with Absent Without Official Leave (AWOL)" if [she] did not leave the meeting." J.A. 446.

As a result of the discovery that Bonds had improperly transmitted the protected agency information, in March 2006 Bonds was placed on paid administrative leave. Events took another bad turn for Bonds on March 27, 2006, when the FDA placed a "Full Clinical Hold" on the Baby Hug trial because of a lack of expiration dates on the bottles of the drugs being used in the study. J.A. 131. In connection with Bonds's submission of the Baby Hug Investigational New Drug ("IND") application to the FDA, Bonds had attached a copy of the label that was to be used on study treatment bottles. Importantly, that label included an expiration date for the drug. Staff members Annette Quinones, Michael Soler, and Thomas Shaffer of the Supply Services Center, which was responsible for printing the labels, maintained that at a Baby Hug Steering Committee meeting in August 2003 Bonds ordered removal of the expiration dates since stability tests regarding the drug were ongoing. Bonds denied that she made any such order.

The placement of the trial on full clinical hold carried with it serious consequences, as it required investigators at the medical centers involved with the trial to "cease further enrollment" and "remove all patients from existing drug/placebo." J.A. 140. Moore explained that "[i]t is very possible that removal of the drug from infants may allow organ damage to proceed during this hold period and potentially reduce the chances of determining a statistical difference in the primary outcomes, namely, spleen and kidney function." J.A. 140.

Primarily based on Bonds's negligence in bringing about the clinical hold and on her improper dissemination of the potentially damaging budget information, Moore proposed on May 12, 2006, that Bonds be terminated. Moore considered Bonds's denial of the claim that she instructed the expiration dates to be removed, but found it not credible in light of the contrary statements of the Supply Services Center staff. Moore also identified several other reasons that he maintained justified Bonds's removal from federal service, including many instances of her failure to follow instructions from her superiors and her failure to follow NHLBI policy.

On October 18, 2006, Peterson accepted Moore's termination proposal (although he rejected some of the reasons Moore provided), memorializing his analysis in a notice of termination document. Peterson requested that NHLBI Deputy Executive Officer Timothy Wheeles evaluate the termination decision in light of the written record, as Wheeles had not been involved in the events leading up to Bonds's termination. Wheeles concluded that each reason Peterson provided in the termination notice was substantially supported and that Bonds's rebuttal failed to counter the supporting documentation.

Bonds initiated an administrative EEO complaint on February 16, 2007, in which she alleged:

377

> I was fired on October 24, 2006 in retaliation for having filed 3 prior EEO Complaints and a Whistleblower Complaint with the Office of Special Counsel. On *377 October 11, 2005, I was removed as the program officer for the SWiTCH Trial; and November 15, 2005, I was removed as the project officer for the BABY HUG Trial after I ordered the destruction of genetic material that had been obtained by Dr. Russell Ware of St. Jude Children's Hospital without informed consent. My order to have the genetic material destroyed was overruled by Dr. Peterson, and when I protested to Dr. Elizabeth Nabel, Director of NHLBI, I was removed as the project officer for the BABY HUG Trial. I then filed a Whistle-blower Complaint with the Office of Special Counsel, and this complaint was accepted for investigation on March 17, 2006. When my EEO Counselor, Michael Chew, notified Dr. Peterson that I had the right to speak to my attorney, Dr. Peterson read all of my email to my attorney and placed me on administrative leave. I was notified that I would be fired on October 24, 2006 after I was accused of doing something that I did not do by the BABY HUG Drug Distribution Center at Perry Point, Md. This accusation was made in retaliation for my prior EEO activity and my Whistleblower Complaint as well as to avoid accepting responsibility by the Perry Point staff for having removed the expiration date from the BABY HUG Study Treatment labels without written authorization from me. Blaming me for this misconduct [permits] the true culprits at Perry Point to escape responsibility and sanctions from the Food and Drug Administration and made it possible for Dr. Peterson to have the excuse to fire me which he has been attempting to do because of my prior EEO complaints against him.
>
> In addition, Dr. Peterson did not provide me with adequate support staff help to assist me with filing which I needed because of my physical limitations. I have a partially paralyzed right leg and my knee joint in that leg was replaced in 2004. Because of these physical limitations, I was unable to stand for any length of time to file any paperwork in my office.

J.A. 363-64.

NIH's EEO division accepted Bonds's complaint as a "mixed-case complaint of discrimination" because it contained discrimination claims and her "allegation (removal from the Federal Service) stems from an action that may be appealed to the [Merit System Protection Board]." J.A. 775. It further stated that the complaint was accepted for investigation of claims of race, sex, age, and physical disability discrimination and retaliatory termination.

Having received no administrative action on the charge by September 13, 2007, Bonds filed a complaint in federal district court against Michael Leavitt, the then-Secretary of Health and Human Services, et al., alleging three Title VII claims: that she was exposed to a hostile work environment, that she suffered illegal retaliation, and that she was discriminated against because of her race and gender. See 42 U.S.C.A. § 2000e-16 (West 2003 & Supp. 2010). The complaint also alleged that she was retaliated against in violation of the Whistleblower Protection Act ("WPA"), see 5 U.S.C.A. § 2302(b)(8) (West 2007), and that she was unjustifiably terminated in violation of the Civil Service Reform Act of 1978 ("CSRA"), see 5 U.S.C.A. § 7513 (West 2007).

The defense responded with a motion to dismiss or, in the alternative, for summary judgment. After the district court heard argument, the defense withdrew the motion as to the WPA claim, the district court granted the motion as to Bonds's hostile-environment and CSRA claims, and the court ordered additional discovery. Once discovery had concluded, the defense

378   renewed its motion and Bonds moved for *378 reconsideration of the dismissal of her CSRA claim. The court granted the defense motion and denied Bonds's. *See Bonds v. Leavitt,* 647 F.Supp.2d 541 (D.Md.2009). Bonds now appeals.

## II.

In dismissing Bonds's CSRA claim, the district court determined that Bonds had failed to exhaust her administrative remedies. In denying her motion for reconsideration, the court also expressed serious doubts regarding whether it possessed subject matter jurisdiction, questioning whether the CSRA provides for a direct right of action in district court. *See id.* at 579-81. Bonds argues that the district court erred in dismissing her claim. We agree.

"The CSRA comprehensively overhauled the civil service system, creating a framework for evaluating adverse personnel actions against federal employees." *Hall v. Clinton,* 235 F.3d 202, 204 (4th Cir.2000) (internal quotation marks and alteration omitted); *see also* 5 U.S.C.A. § 7513(a) (providing that "[u]nder regulations prescribed by the Office of Personnel Management, an agency may take an action covered by this subchapter against an employee only for such cause as will promote the efficiency of the service."). "[I]t established exacting standards for review of such actions by the" Merit Systems Protection Board ("MSPB"). *Lindahl v. Office of Pers. Mgmt.,* 470 U.S. 768, 774, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985). It also governs the adjudication of "mixed case complaints," meaning complaints alleging "employment discrimination filed with a federal agency based on race, color, religion, sex, national origin, age, disability, or genetic information related to or stemming from an action that can be appealed to the" MSPB. 29 C.F.R. § 1614.302(a)(1). Actions that can be appealed to the MSPB include, *inter alia,* removal from federal service, including retaliatory termination for protected whistle-blower activity. *See* 5 U.S.C.A. § 1214(a)(3) (West 2007); *see also* 5 U.S.C. § 7512 (West 2007).

An employee wishing to pursue a mixed case has several procedural paths she can take:

> At the outset, the aggrieved party can choose between filing a "mixed case complaint" with her agency's EEO office and filing a "mixed case appeal" directly with the MSPB. *See* 29 C.F.R. § 1614.302(b). By statute, the relevant agency EEO office and the MSPB can and must address both the discrimination claim and the appealable personnel action. *See* 5 U.S.C. § 7702(a). Should she elect the agency EEO route, within thirty days of a final decision she can file an appeal with the MSPB or a civil discrimination action in federal district court. *See* 29 C.F.R. §§ 1614.302(d)(1)(ii), 1614.302(d)(3), 1614.310(a). If 120 days pass without a final decision from the agency's EEO office, the same avenues of appeal again become available: the complainant can file either a mixed case appeal with the MSPB or a civil action in district court. *See* 5 U.S.C. §§ 7702(e)(1)(A), 7702(e)(2); 29 C.F.R. §§ 1614.302(d)(1)(i), 1614.310(g); 5 C.F.R. § 1201.154(b)(2).

*Butler v. West,* 164 F.3d 634, 638 (D.C.Cir. 1999) (footnotes omitted). Here, Bonds filed a mixed case EEO complaint, then filed this action in the district court when the requisite time passed without an administrative decision.

Bonds maintains that the district court possessed jurisdiction over her claim under 5 U.S.C.A. § 7702(e) (West 2007), which provides that after the required time has passed without administrative action on an EEO complaint, "an employee shall be
379   entitled to file a civil action to the same extent and in the same manner as provided in section 717(c) of the Civil *379 Rights Act of 1964 (42 U.S.C. 2000e-16(c)), section 15(c) of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 633a(c)), or section 16(b) of the Fair Labor Standards Act of 1938 (29 U.S.C. 216(b))."[7] The district court questioned whether it lacked subject matter jurisdiction over Bonds's CSRA claim because § 7702(e) should be read to include district court review of only the discrimination claims in a mixed-case complaint, not the nondiscrimination claims. *See Bonds,* 647 F.Supp.2d at 579-81. However, as the district court acknowledged, each circuit court of appeals to have addressed this issue has concluded that district courts possess jurisdiction over non-discrimination claims in mixed cases when agencies fail to meet the time limit that § 7702(e)(1)(B) establishes. *See Ikossi v. Dep't of Navy,* 516 F.3d 1037, 1041-44 (D.C.Cir.2008); *Seay v. TVA,* 339 F.3d 454, 471-72 (6th Cir.2003); *Doyal v. Marsh,* 777 F.2d 1526, 1533, 1535-37 & n. 5 (11th Cir.1985). Finding their reasoning persuasive, we adopt that position as well.

We therefore turn to the question of whether Bonds exhausted her administrative remedies for her CSRA claim. In the context of *Title VII,* prior to filing a discrimination claim, a claimant is required to exhaust administrative remedies with the EEOC or its state equivalent. *See Nealon v. Stone,* 958 F.2d 584, 590 (4th Cir.1992). This is because courts possess jurisdiction over only those claims "like or related to allegations contained in the charge and growing out of such allegations." *Id.* (citations omitted). Thus, "factual allegations made in formal litigation must correspond to those set forth in

Bonds v. Leavitt, 629 F. 3d 369 - Court of Appeals, 4th Circuit 2011 - Google Scholar

the administrative charge." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir.2005). "[A] claim in formal litigation will generally be barred if the EEOC charge alleges discrimination on one basis, such as race, and the formal litigation claim alleges discrimination on a separate basis, such as sex." *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir.2009). However, because administrative charges are not typically completed by lawyers, they must be construed liberally. See *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 460 (4th Cir. 1988).

380

In this case, the district court concluded that these same rules that apply in the Title VII context also apply to Bonds's CSRA claim and that Bonds failed to properly raise a CSRA claim in her EEO charge. See *Bonds*, 647 F.Supp.2d at 581-87. We conclude, however, that Bonds's EEO complaint sufficiently raised the claim. Regarding the CSRA claim, the complaint alleges that Bonds "did not engage in the misconduct alleged as a basis "380 for her termination," and that alternatively, termination was an "overly harsh" penalty. J.A. 24. The claim, in other words, is that, even aside from any improper motivations behind her firing, her firing was not warranted. See *Guillot v. Garrett*, 970 F.2d 1320, 1323 n. 3 (4th Cir.1992) (noting that "5 U.S.C. 7513 permits an agency to terminate an employee `for such cause as will promote the efficiency of the service'"). Considering that we must liberally construe EEO charges, we conclude that Bonds's claim is firmly grounded in her charge, wherein she explicitly alleged: "I was notified that I would be fired on October 24, 2006 after I was accused of doing something that I did not do." J.A. 364. We therefore reverse the dismissal by the district court of Bonds's CSRA claim and remand for further proceedings regarding that claim.

## III.

We now turn to Bonds's WPA claim. The WPA, codified at 5 U.S.C. § 2302(b)(8), contains two subsections, one of which (§ 2302(b)(8)(B)) protects whistle-blowing to "Special Counsel, or to the Inspector General of an agency or another employee designated by the head of the agency to receive such disclosures," and one (§ 2302(b)(8)(A)) that applies to all other whistle-blowing. Bonds contends on appeal that she created genuine issues of material fact regarding whether both subsections were violated and thus argues that the district court erred in granting summary judgment against her.

We review the district court's grant of summary judgment de novo, viewing the facts and the reasonable inferences therefrom in the light most favorable to the nonmoving party. See *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir.2005). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Applying this standard, we agree with Bonds regarding both subsections, and we will address the two seriatim.

## A.

Bonds's WPA claim under subsection A alleges, as is relevant here, that she suffered retaliation for reporting the cell line issue to Nabel. The district court determined that Bonds failed to create a genuine issue of material fact regarding whether she engaged in protected activity under subsection A because (1) she did not report her concerns to an authority who was in a position to correct the alleged wrongdoing, and (2) because reporting that wrongdoing was within her routine job duties and she did not report the wrongdoing outside the normal channels. See *Bonds*, 647 F.Supp.2d at 574-76. Bonds argues that the district court erred with regard to both rulings. We agree.

The enactment of the WPA served to broaden the definition of "prohibited personnel practice" that then existed in the CSRA. As is relevant here, the WPA provides that:

> [a]ny employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority ...
>
> . . . .
>
> (8) take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment *because of* —

Bonds v. Leavitt, 629 F. 3d 369 - Court of Appeals, 4th Circuit 2011 - Google Scholar

381

(A) *any* disclosure of information by an employee or applicant which the *381 employee or applicant reasonably believes evidences —

(i) a violation of any law, rule, or regulation, or

(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

5 U.S.C. § 2302(b)(8)(A) (emphasis added). Before enactment of the WPA, the CSRA defined a "prohibited personnel practice," in relevant part, as "tak[ing] or fail[ing] to take a personnel action ... *as a reprisal for ... a disclosure of information.*" Civil Service Reform Act of 1978, Pub.L. No. 95-454, § 101(a), 92 Stat. 1111, 1114 (1978) (emphasis added). The Senate Committee on Governmental Affairs explained the purpose behind the change from "a disclosure" to "any disclosure":

> The Committee intends that disclosures be encouraged. The OSC, the Board and the courts should not erect barriers to disclosures which will limit the necessary flow of information from employees who have knowledge of government wrongdoing. For example, it is inappropriate for disclosures to be protected only if they are made for certain purposes or to certain employees or only if the employee is the first to raise the issue. [The Senate bill] emphasizes this point by changing the phrase "a disclosure" to "any disclosure" in the statutory definition. This is simply to stress that *any* disclosure is protected (if it meets the requisite reasonable belief test and is not required to be kept confidential).

S.Rep. No. 100-413, at 13 (1988).

To establish a claim for WPA retaliation, Bonds was required to show that she made a protected disclosure under 5 U.S.C. § 2302(b)(8) and she suffered an adverse personnel action based on her disclosure of the cell line issue to Nabel. *See Hooven-Lewis v. Caldera*, 249 F.3d 259, 276 (4th Cir.2001). Despite the statute's very broad language, the district court ruled that *Hooven-Lewis* added a judicial gloss onto the statute that would prevent protection of a disclosure to a superior who lacked the actual authority to put an end to the complained-of conduct. *See Bonds*, 647 F.Supp.2d at 574, 576. Because the court determined as a matter of law that Nabel did not have such authority, it granted summary judgment against Bonds. *See id.* at 576. We do not believe *Hooven-Lewis* dictated that result.

In *Hooven-Lewis*, we held that complaining to a supervisor about the supervisor's own wrongdoing is not protected conduct under the WPA. *See Hooven-Lewis*, 249 F.3d at 276. In so doing, we noted that an element of a WPA cause of action is that "the disclosure evidence an intent to raise an issue with a higher authority who is in a position to correct the alleged wrongdoing." *Id.* Applying that rule, we held that the plaintiff's statements to the wrongdoer herself "did not evidence an intent to disclose [the] wrongdoing to an authority higher than [the wrongdoer] who could remedy the wrongdoing." *Id.*

Initially, we note that we do not agree that *Hooven-Lewis* requires that, to constitute protected conduct, the report must be made to a person that the would-be whistle-blower believes has actual authority to correct the wrongdoing. The essence of the decision in that case is merely that no disclosure occurs *to anyone* when a report is made to the wrongdoer himself because the wrongdoer is already necessarily aware of his own conduct. *See Huffman v. Office of Pers. Mgmt.*, 263 F.3d 1341, 1349-50 (Fed.Cir.2001). After all, the statute, referencing "any disclosure," does not specify to whom the disclosure must be made in order to receive protection. We therefore conclude that the district court erred in ruling that Nabel's lack of actual authority to have the *382 cell lines destroyed doomed Bonds's subsection A WPA claim.[9]

382

Having prevailed on that point, Bonds still must clear another hurdle to avoid summary judgment under subsection A. That hurdle is the district court's ruling, based on *Huffman*, that her disclosure to Nabel was not protected because it was made as a normal part of Nabel's duties through normal channels. *See Bonds*, 647 F.Supp.2d at 574-76. This exception to the general disclosure rule was an extension of *Willis v. Department of Agriculture*, 141 F.3d 1139 (Fed.Cir.1998), wherein the Federal Circuit held that a government employee whose job it is to investigate the actions of private parties does not engage in protected activity when he reports violations of law by those private parties as a normal part of his duties. *See id.* at 1143-44. The *Willis* court emphasized that "the WPA is intended to protect government employees who risk their own personal job security for the advancement of the public good by disclosing abuses by government personnel." *Id.* at 1144.

Even assuming that we would sanction such an exception in our circuit, we do not believe it would entitle the defendants to summary judgment in this case. The district court determined that Bonds's disclosure to Nabel was not protected because supervising Ware and reporting problems to senior NHLBI officials were part of her duties and because Nabel, while not

Bonds's supervisor, was in Bonds's *line* of supervision, albeit three levels up.[9] *See Bonds*, 647 F.Supp.2d at 575. Regardless, however, of whether Nabel was somewhere in Bonds's line of supervision, there was no evidence forecasted that Bonds had a responsibility to report any concerns to Nabel as part of Bonds's normal duties. Bonds's job description describes her role as an advisor to the DBDR and to Moore. And, Moore himself testified that he considered Bonds's decision to bring her concerns to Nabel to be "unprofessional," so much so that he testified in his deposition that he "probably should have" disciplined her for it. J.A. 2089. Nabel echoed Moore's view of Bonds's duties and testified in her deposition that Bonds's responsibility was to express any concerns to her supervisor, not to her. Nabel testified that even if Bonds believed that Peterson was engaged in unethical or unlawful conduct, *Bonds had no responsibility to bring her concerns to Nabel's attention*, and she noted that there are federal offices designed to deal with such allegations. Under these facts, we hold that the district court erred in granting summary judgment against Bonds. *See Huffman*, 263 F.3d at 1354 (concluding that a plaintiff engages in protected activity when he, "feeling that the normal chain of command is unresponsive, reports wrongdoing outside of normal channels").

## B.

383    We now turn to Bonds's subsection B claim that she suffered retaliation based *383 on her report to the OSC of the cell line issue. The district court ruled that Bonds's claim failed as a matter of law because she did not create a genuine factual issue regarding whether Peterson knew that Bonds's whistle-blowing was the catalyst for the government's investigation regarding the cell lines. *See Bonds*, 647 F.Supp.2d at 577-79; *see also Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998) (explaining, with regard to Title VII retaliation claims, that "the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary" to establish a causal connection between the protected activity and the adverse employment action). Bonds challenges this ruling, emphasizing that Peterson knew of the investigation since he was one of the people interviewed. She adds that she would have been the only person Peterson would have suspected of bringing about the investigation as she was the only one vigorously opposing the retention of the cell lines. She further highlights the fact that Moore learned of Bonds's report to the OSC on January 18, 2006, when he downloaded a copy of her disclosure statement onto his computer.[10] Bonds argues that a jury could reasonably infer that Moore would have told Peterson about Bonds's contact with the OSC. We agree with Bonds that she created a genuine issue of material fact concerning whether Peterson knew at the time he terminated her that she had "blown the whistle" to the OSC.

Even ignoring Moore's knowledge that Bonds's disclosure had prompted the OSC's investigation, the evidence suggests that Peterson had plenty of reason to conclude that Bonds, as the only person vehemently resisting the retention of the cell lines, was the catalyst for the investigation. Bonds's poor relationship with Moore and Peterson only gave Peterson further reason to believe that Bonds would report the alleged malfeasance and his role in it. We therefore hold that the issue of whether Peterson knew when he terminated Bonds that her report had brought on the investigation was properly one for a jury to resolve.

## IV.

Bonds's complaint alleges three Title VII claims. We will address them seriatim.

## A.

As is relevant here, Bonds's complaint alleges a Title VII claim that she was retaliated against for opposing the retention of the cell lines. In opposing summary judgment in the district court, Bonds maintained that because the donors of the genetic material from which the cell lines were created were primarily African-American, she was opposing racial discrimination by seeking to destroy the lines. On that basis, she maintained that her conduct was protected under Title VII, and that Title VII prohibited her employer's retaliation against her. In granting summary judgment against her, the district court rejected her argument and ruled that because Bonds's conduct did not constitute opposition to an unlawful *employment* practice, it was not protected under Title VII. *See Bonds*, 647 F.Supp.2d at 566-70. On appeal, Bonds maintains that Title VII protected her

384    from retaliation based on her opposition to the use of the cell lines regardless of *384 whether the conduct she opposed constituted *employment* discrimination. We disagree.

As is relevant here, Title VII makes it "an unlawful employment practice for [a private] employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a)(1) (West 2003); *see* 42 U.S.C.A. § 2000e(b) (West 2003). It also prohibits retaliation by a private employer against an employee because she "has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C.A. § 2000e-3(a) (West 2003). Title VII is not a general bad acts statute, however, and it does not prohibit private employers from retaliating against an employee based on her opposition to discriminatory practices that are outside the scope of Title VII. *See Crowley v. Prince George's County, Md.,* 890 F.2d 683, 687 (4th Cir.1989).

In 1972, Congress expanded Title VII's coverage to include employees of federal executive agencies and other particular categories of federal employees. *See* Equal Employment Opportunity Act of 1972, Pub.L. 92-261, 86 Stat. 103 (1972) (codified as amended at 42 U.S.C.A. § 2000e-16). Section 2000e-16(a) provides that all personnel actions taken in regard to these employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin." Unlike § 2000e-3(a), § 2000e-16(a) does not explicitly provide protection against retaliation. *See Baqir v. Principi,* 434 F.3d 733, 747 n. 16 (4th Cir.2006). However, 42 U.S.C.A § 2000e-16(d) provides that "[t]he provisions of section 2000e-5(f) through (k) of this title, as applicable, shall govern civil actions brought hereunder." Section 2000e-5(g), in turn, provides:

> No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin *or in violation of section 2000e-3(a) of this title.*

42 U.S.C.A. § 2000e-5(g)(2)(A) (West 2003) (emphasis added). Although neither the Supreme Court nor our court has squarely addressed whether 2000e-16(a) prohibits retaliation, *see Gomez-Perez v. Potter,* 553 U.S. 474, 488 n. 4, 128 S.Ct. 1931, 170 L.Ed.2d 887 (2008); *Baqir,* 434 F.3d at 747 n. 16, reading these provisions together leaves us with little doubt that Congress "incorporated the protections against retaliation" afforded to private employees by 2000e-3(a). *Ayon v. Sampson,* 547 F.2d 446, 450 (9th Cir.1976); *see Gomez-Perez v. Potter,* 476 F.3d 54, 60 (1st Cir.2007) (similar), *rev'd on other grounds,* 553 U.S. 474, 128 S.Ct. 1931, 170 L.Ed.2d 887 (2008); *Porter v. Adams,* 639 F.2d 273, 277-78 (5th Cir.1981) (similar); *see also Baqir,* 434 F.3d at 742 ("Although phrased differently, [§ 2000e-3(a) ] and [§ 2000e-16(a) ] have generally been treated as comparable."); *Hale v. Marsh,* 808 F.2d 616, 619 (7th Cir.1986) (stating that § 2000e-16(a) "has been interpreted to incorporate" § 2000e-3(a)); *cf. Gomez-Perez,* 553 U.S. at 487, 128 S.Ct. 1931 (holding that ADEA provision "patterned 'directly after'" § 2000e-16(a) bans retaliation). Nonetheless, we see no basis for concluding that conduct of the type at issue here — which would not be protected by § 2000e-3(a) if undertaken by a private employee — should be protected by § 2000e-16(a). The district *385 court was therefore correct to grant summary judgment against Bonds on this claim.[11]

385

## B.

Bonds next argues that the district court erred in dismissing her hostile work environment claim for failure to state a claim. *See* Fed.R.Civ.P. 12(b)(6). We disagree.

We review de novo the grant of a motion to dismiss for failure to state a claim. *See U.S. Airline Pilots Ass'n v. Awappa, LLC,* 615 F.3d 312, 317 (4th Cir.2010). In so doing, "we must accept as true all of the factual allegations contained in the complaint." *Anderson v. Sara Lee Corp.,* 508 F.3d 181, 188 (4th Cir.2007) (internal quotation marks omitted). To survive dismissal, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

To proceed on a Title VII hostile work environment claim, "a plaintiff must show that the offending conduct (1) was unwelcome, (2) was because of her sex [or race], (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ziskie v. Mineta,* 547 F.3d 220, 224 (4th Cir.2008) (internal quotation marks omitted). Establishing the third element requires that the plaintiff show that the work environment was not only subjectively hostile, but also objectively so. *See EEOC v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 315 (4th Cir.2008). Such proof depends upon the totality of the circumstances, including "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks omitted).

Bonds's allegations, which largely include the actions taken against her in response to the concerns regarding her performance, fall well short of alleging an abusive working environment. *See Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)* ("[N]ormally petty slights, minor annoyances, and simple lack of good manners will not" give rise to a hostile environment claim.). Nor do they state a plausible claim that any harassment that Bonds suffered was due to her race or gender. *Cf. Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 80, 118 S.Ct. 998,

386    140 L.Ed.2d 201 (1998) ("Title VII does not prohibit all verbal or physical *386 harassment in the workplace; it is directed only at `discriminat[ion] ... because of... sex.'"). The district court was therefore correct to dismiss this claim.

## C.

Bonds also maintains that the district court erred in granting summary judgment against her on her Title VII claim alleging in relevant part that she was terminated because of her race and gender. We disagree.

Lacking any direct evidence of such discrimination, Bonds attempts to avoid summary judgment based on the burden-shifting method of proof established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this method, the plaintiff has the initial burden to establish a prima facie case, which she may do by showing that "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir.2004) (en banc). If a plaintiff meets that burden, the burden then shifts to the employer "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If the employer does so, the plaintiff must then show that "the employer's stated reasons were not its true reasons, but were a pretext for discrimination." *Id.* (internal quotation marks omitted).

The district court ruled that even assuming that Bonds established a prima facie case, the defense articulated legitimate, nondiscriminatory reasons for her removal and Bonds failed to create a genuine issue of material fact regarding whether those reasons were a pretext for race or gender discrimination. *See Bonds,* 647 F.Supp.2d at 554, 559-66. We agree. Peterson articulated at length the reasons that he sustained Moore's recommendation that Bonds be terminated. Bonds does not seriously argue that Peterson did not believe his reasons warranted her termination. In fact, her only significant argument regarding her unauthorized disclosure of agency information was that the disclosure was uncovered only as the result of an improper investigation. Similarly, her primary argument regarding her responsibility for the removal of the expiration dates from the drugs being used in the trial was that Peterson did not conduct a proper investigation before concluding that she was actually responsible. Neither of these points is of any help to Bonds. Even if these investigations were improper or substandard, that does little to help her establish that the reasons given for her termination were not the actual reasons, and it certainly does not give rise to a reasonable inference that her race or gender was the real reason for her termination. *See Hux v. City of Newport News,* 451 F.3d 311, 315 (4th Cir.2006) ("Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it."); *see also Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 444 (4th Cir.1998) ("It is the perception of the decision maker which is relevant."), overruled on other grounds by *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 105, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). The district court was therefore correct to grant summary judgment on this claim.[12]

387    *387 V.

For the foregoing reasons, we reverse the dismissal of Bonds's CSRA claim and the grant of summary judgment against her on her WPA claim, and remand to the district court for further proceedings on these claims. Otherwise, we affirm.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

[1] Sickle cell disease is an inherited blood disorder that affects red blood cells. *See Sickle cell disease,* Genetics Home Reference, http://ghr.nim.nih.gov/condition/sickle-cell-disease (last visited Nov. 8, 2010). In this country, the disease most commonly afflicts African-

12/16/2018                     Bonds v. Leavitt, 629 F. 3d 369 - Court of Appeals, 4th Circuit 2011 - Google Scholar

Americans, but it also affects many other racial groups. *See Genetic Disease Profile: Sickle Cell Anemia,* Human Genome Project Information, http://www.ornl.gov/sci/ techresources/Human_Genome/posters/ chromosome/sca.shtml (last visited Nov. 8, 2010).

People who have sickle cell disease have red blood cells that contain mostly hemoglobin S. *See* About Sickle Cell Disease — Sickle Cell Disease Association of America, http:// www.sicklecelldisease.org/about_scd/index. phtml (last visited Nov. 8, 2010). These cells can sometimes become sickle or crescent shaped and have difficulty passing through small blood vessels. *See id.* Blockages of small blood vessels by these cells can restrict the amount of blood reaching that part of the body and can eventually result in damage to the tissue that is not receiving its normal blood flow. *See id.* Sickle cells are rapidly destroyed in the bodies of people having the disease, resulting in anemia, jaundice and the formation of gallstones. *See id.* Sickle cells also can cause lung tissue damage, pain episodes, stroke and priapism. *See id.* It can also cause damage to most organs, including the spleen, kidneys, and liver. *See id.* Spleen damage to those suffering from the disease can leave them easily overwhelmed by certain bacterial infections. *See id.*

[2] Moore replaced Dr. Herman Branson, whom Peterson had terminated. Branson filed an EEO complaint concerning his termination, and in the context of the complaint, alleged that Peterson "sought to enlist [Branson's] support to carry out reprisals against" Bonds because of her prior EEO complaints. J.A. 792. He also submitted an affidavit of Dr. Jean Henslee-Downey in which she stated that "Bonds was on [Peterson's] bad list." J.A. 601.

[3] The complaint was resolved through the NIH Ombudsman Office.

[4] Bonds alleges that the participating infants were all African-Americans.

[5] The consent forms obtained from parents of the infant participants in Baby Hug stated in pertinent part:

We would like to have a small amount of left-over blood samples stored at the BABY HUG Central laboratory for possible future research. The blood samples would be kept for a long time or until the samples are used up. If your child's blood or DNA sample is shared with other researchers, your child's identi[t]ly will be kept confidential. No facts that could identify your child will be given with the blood sample or its DNA.

You may choose whether or not to allow your child's sample to be used for research. No matter what you decide to do about the use of your child's samples, your child can still take part in the BABY HUG study. If you agree to allow your child's blood to be kept for research, you are free to change your mind at any time. If this happens, we ask that you contact Dr. Wang by phone or in writing and let him know that you are withdrawing your permission for your child's blood to be used for research. Any unused blood will be destroyed.

J.A. 516 (internal quotation marks omitted).

[6] The MSH follow-up extension was "a five year extension of the follow-up study of sickle cell adult patients who enrolled in the Multi-center Study of Hydroxyurea." J.A. 116.

[7] 5 U.S.C. § 7702(e)(1), states in its entirety as follows:

Notwithstanding any other provision of law, if at any time after —

(A) the 120th day following the filing of any matter described in subsection (a)(2) of this section with an agency, there is no judicially reviewable action under this section or an appeal under paragraph (2) of this subsection;

(B) the 120th day following the filing of an appeal with the Board under subsection (a)(1) of this section, there is no judicially reviewable action (unless such action is not as the result of the filing of a petition by the employee under subsection (b)(1) of this section); or

(C) the 180th day following the filing of a petition with the Equal Employment Opportunity Commission under subsection (b)(1) of this section, there is no final agency action under subsection (b), (c), or (d) of this section;

an employee shall be entitled to file a civil action to the same extent and in the same manner as provided in section 717(c) of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16(c)), section 15(c) of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 633a(c)), or section 16(b) of the Fair Labor Standards Act of 1938 (29 U.S.C. 216(b)).

[8] We note that there is no question in this case that Bonds went to Nabel in an attempt to remedy the wrongdoing she sought to disclose. Bonds herself had ordered destruction of the cell lines before she was undercut by her superiors. She then persuaded Nabel to issue the same order, only to have Nabel later reconsider her decision. And, even after reconsidering her decision, Nabel still wrote to the IRBs, recommending that they obtain specific consent from the patients for retention of the immortalized cells or destroy the cell lines. *Cf.* *Huffman, 263 F.3d at 1351* ("Any government employee, in a supervisory position, other than the wrongdoer himself, is in a position to `correct' or `remedy' the abuse by bringing the matter to the attention of a higher authority.").

[9] Peterson, who was Moore's supervisor, reported directly to Nabel.

[10] Bonds notes that when Moore was initially questioned about when he learned that Bonds had communicated with OSC, he incorrectly denied knowing about it until after he issued notice of her removal. Only when presented with documentary evidence that he learned of the communications on January 18, 2006, did he accept that date.

[11] Bonds also maintains that her opposition was protected under Title VII based on her professional duty to "ensur[e] that [study] participants were not subjected to discriminatory treatment." Appellant's brief, at 33. In support of her position, Bonds cites *Wrighten v.*